IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH INSTAGRAM ACCOUNT UID 67720752584 THAT ARE STORED AT PREMISES CONTROLLED BY META PLATFORMS. | Case No. 1:24-SW-940<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Tyler Ellefson, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application for a search warrant for information associated with one Instagram account, that is, User ID 67720752584 ("TARGET ACCOUNT"), which is stored at premises owned, maintained, controlled, or operated by Meta Platforms, an electronic communications service and/or remote computing service provider headquartered at 1 Meta Way, Menlo Park, CA 94025.

2.     The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta Platforms to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

3.       I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been an FBI Special Agent for approximately three years. In preparation for this assignment, and as part of my continued education, I have successfully completed law enforcement and national security focused training, including formal courses and training exercises. I have already participated in many aspects of federal investigations including, but not limited to, subject and witness interviews, analysis of telephone and financial records, and preparing and executing physical search warrants, digital search warrants, and arrest warrants. As a federal agent, I am authorized to investigate violations of the laws of the United States. As a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States.

4.       The facts in this affidavit come from my personal observations, my training and experience, and information obtained from legal process, open-source research, and other agents and witnesses.  When I write that an event occurred on a specific date or in a specific month, I mean to convey that the event occurred "on or about" that date or month. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter

5.       Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 2339B (Providing Material Support or Resources to Designated Foreign Terrorist Organizations), 18 U.S.C. § 2339A (Providing Material Support to Terrorists), 18 U.S.C. § 2332a(a)(2) (Use of weapons of mass destruction causing death), 18 U.S.C. § 842(p)(2)(A) (Distribution of information relating to explosives, destructive devices, and weapons of mass destruction in furtherance of the commission of a federal crime of violence, that is 18 U.S.C. §§ 1116(a), (b)(3)(B), 1111 (first-degree murder of internationally protected persons)) (hereinafter "Target Offenses") are being committed by Abdullah Ezzeldin

Taha Mohamed Hassan (hereinafter "HASSAN") who resides in the Eastern District of Virginia at the premises located at 6166 Leesburg Pike Apt. D215, Falls Church, VA. There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

6.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A). Specifically, the Court is "a district court of the United States…that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7.      HASSAN is a national of Egypt currently living in Falls Church, Virginia and who is currently in removal proceedings with the U.S. Immigration and Customs Enforcement.

**I.      HASSAN Operated Several Pro-ISIS and Al Qaeda Accounts that Promoted Violence Against Jews.**

    **A.      HASSAN operated X account X ACCOUNT 1.**

8.      On May 4, 2024, Fairfax County Police Department informed FBI that it had received an anonymous tip regarding an X Corp. ("X") account user. The user was reportedly based in Virginia. The tipster described the account as engaging in "radical and terrorist-leaning behavior." The tipster reported the username, which is known to your affiant (hereinafter "X ACCOUNT 1").

9.      Records from X revealed that X ACCOUNT 1 was registered to email address abdullah.et.hassan@[xxxxxx].com and phone number (571)-xxx-xxxx (hereinafter "PHONE NUMBER 1"). X ACCOUNT 1 was created using an identified IP Address (hereinafter "IP ADDRESS 1") on January 1, 2024.

10.     Records from Verizon showed that on January 1, 2024, IP ADDRESS 1 was associated with a specific Verizon customer ID subscribed to by HASSAN's father. The land address associated with the same Verizon customer ID is HASSAN's home address in Falls Church, Virginia.  IP ADDRESS 1 was assigned to HASSAN's home address in Falls Church, Virginia.

11.     In April of 2024, HASSAN reported PHONE NUMBER 1 as his phone number to Immigration and Customs Enforcement.

12.     Based on the above, the FBI assesses that HASSAN operates X ACCOUNT 1.

13.     A review of the publicly available information associated with X ACCOUNT 1 revealed HASSAN posted the following content:

> a.     On March 21, 2024, HASSAN made a post about martyrdom and the guarantees of paradise for martyrs. HASSAN stated, "Because all of those martyrs have been guaranteed paradise, this life is a test and we can leave it at any time for the afterlife[.]"

> b.     On March 27, 2024, while debating other X users, HASSAN made a post emphasizing that he believed that "Islam is a religion of justice, not peace[.]" HASSAN earlier commented, "If your entire family was murdered by someone, would you give them hugs and kisses? Islam is a religion of justice[.]"

> c.     On April 8, 2024, HASSAN argued with another X user stating, "Hamas are an armed resistance, what terroristic about them? Have you only hear of the conflict since Oct 7th? IDF have been committing war crimes for decades g, it's only time Palestine fight back[.]"

> d.     On April 9, 2024, HASSAN commented on a post about the Islamic State of Iraq and the Levant ("ISIS") threatening attacks on stadiums hosting the UEFA Champions League quarterfinals, "Praying for an ISIS masterclass uno...[.]"

> e.     On May 1, 2024, HASSAN made a post revering Osama bin Laden and Ayman Al Zawahiri.[1] He replied to a photo posted of them stating, "Lmao explain

---

[1] Al Zawahiri was the second leader of al-Qaeda between Osama bin Laden's death in 2011 and Al Zawahiri's death in 2022.  Al Zawahiri is known for his role in planning various terrorist

how they managed to deal so much damage to the west without being caught/killed for so long, true warriors imo[.]"

f.      On May 2, 2024, HASSAN commented on a post about Osama bin Laden's death by stating, "13 years since my idolo died[.]"[2]

g.      On May 11, 2024, HASSAN made a post indicating possible suicidal ideations by stating, "I may end it all[.]"

h.      On May 12, 2024, HASSAN posted, "Allah azwjl[3] will deal with the American kuffar[4] army[.]"

i.      On May 18, 2024, HASSAN made a comment about murdering people and dumping their bodies in The Thames, a river in England that runs through the City of London.  HASSAN stated, "Murder them and hide their bodies in the Thames, who says no?"

j.      On May 29, 2024, HASSAN explained his opinion about the Gaza conflict, "The Palestinians do not care for help, they have two options: victory or shahada,[5] and both are great reward. You will never eliminate them."

k.      On May 31, 2024, HASSAN commented on a photo of a football player by saying the person's forehead in the picture was a "…sniper's dream[.]"

**B.      HASSAN operated another X account (X ACCOUNT 2).**

14.      On July 24, 2024, the FBI observed a public post from X ACCOUNT 1 that

revealed that HASSAN also operated an X account with a known display name (hereinafter "X

---

attacks, such as the 1998 U.S. embassy bombings in Kenya and Tanzania, the September 11, 2001, terrorist attacks, and the 2002 Bali bombings.

[2] In this Affidavit, I have included quotes as they appeared, including grammar, spelling, punctuation errors.

[3] In my training and experience, I know that "azwjl" is an acronym for an honorific when used next to "Allah."

[4] In my training and experience, I know "Kuffar" to be an Arabic word for "nonbelievers" or "infidels."

[5] In my training and experience, I know that "shahada" is an Arabic word that means martyrdom in this context.

ACCOUNT 2"). In that public post, HASSAN told another user who was attacking the user of X ACCOUNT 2: "…that's my other acc btw[.]"

15.    Records from X revealed that X ACCOUNT 2 was also subscribed to PHONE NUMBER 1 and created using IP ADDRESS 1.

16.    Based on this information and HASSAN's own statements, the FBI determined that X ACCOUNT 2 was operated by HASSAN.

17.    A review of the publicly available information associated with X ACCOUNT 2 revealed HASSAN posted the following content:

l.    On August 2, 2024, HASSAN shared an artificial intelligence's ("AI") analysis of his profile. The analysis stated:

Based on our AI agent's analysis of your tweets, you are a young, radical Islamist extremist who is obsessed with jihad and violence against perceived enemies. Your tweets suggest a deep-seated hatred and intolerance towards those of other faiths, particularly Jews.

HASSAN reposted this post saying, "Alhamduillah," an Arabic word meaning "praise be to God."

m.    On August 6, 2024, HASSAN posted, "Yep I am an extremist[.]"

**C.    HASSAN operated a third X account (X ACCOUNT 3).**

18.    Records provided by X revealed that between August 27, 2024, and August 28, 2024, HASSAN (using X ACCOUNT 1) engaged in direct message communication with another user. In the message, HASSAN told the other user that he had "an Islamic account that's rather on the radical side," and later identified it as a known X account (hereinafter "X ACCOUNT 3").

19.    X records also revealed that on August 27, 2024, X ACCOUNT 1 and X ACCOUNT 3 were both accessed via an IP Address associated with a university campus in

Northern Virginia, within the Eastern District of Virginia. On that same day, the FBI observed HASSAN on that university campus.

20.     Based on this information, the FBI determined that X ACCOUNT 3 was operated by HASSAN.

21.     A review of X ACCOUNT 3 revealed that the account's profile picture depicted Abu Osama al-Masri, the leader of the Islamic State in the Sinai. The "bio" section of X ACCOUNT 3 contained Arabic writing that a public software tool translated as: "now the fight has come."

## II.     HASSAN Planned a Mass Casualty Attack at the Consulate General of Israel Using an Explosive Device and Rifle.

### A.     An FBI confidential human source contacted HASSAN.

22.      On August 24, 2024, an FBI Confidential Human Source ("CHS-1") located X ACCOUNT 3 and observed a post featuring Ahmad Musa Jibril, an Islamic cleric and convicted felon who has promoted militant Islamism via social media. CHS-1 commented on the post that he[6] wanted to attend one of Jibril's lectures; HASSAN responded "Ameen."[7]

23.     On August 25, 2024, CHS-1 commented to X ACCOUNT 3 that CHS-1 hoped HASSAN did not get suspended and asked if HASSAN had Telegram. HASSAN responded that he did have Telegram and direct messaged CHS-1 with an account name (hereinafter "TELEGRAM ACCOUNT 1") and stated "my tg."

---

[6] CHS-1 used a male persona to interact with HASSAN, so I will use male pronouns to refer to CHS-1 throughout this affidavit, although CHS-1's actual gender is not necessarily male.

[7] In my training and experience, I know that "Ameen" means "Amen" in Arabic.

24.    Based on a review of publicly available information within Telegram, the FBI identified that PHONE NUMBER 1 was associated with TELEGRAM ACCOUNT 1.

25.    On September 1, 2024, CHS-1 identified that X ACCOUNT 3 had been suspended on X and contacted HASSAN through TELEGRAM ACCOUNT 1.  On Telegram, HASSAN provided CHS-1 a link to HASSAN's Instagram page (hereinafter "TARGET ACCOUNT"), as well as a Telegram Channel of pro-ISIS Nasheeds.[8]

26.    On September 2, 2024, the FBI observed that the TARGET ACCOUNT's profile picture was the same photograph of Abu Osama al-Masri observed on X ACCOUNT 3.

27.    Records provided by Meta Platforms identified that the TARGET ACCOUNT was associated with PHONE NUMBER 1.

28.    Based on this information, the FBI determined that the TARGET ACCOUNT was operated by HASSAN.

29.    On September 3, 2024, HASSAN, utilizing TELEGRAM ACCOUNT 1, shared ISIS propaganda with CHS-1 and made comments about the growth and strength of ISIS in Afghanistan and West Africa.

30.    On October 14, 2024, HASSAN used TELEGRAM ACCOUNT 1 to provide CHS-1 detailed and complex instructions on how to travel to join ISIS using multiple methods of travel.

31.    On October 26, 2024, CHS-1 identified that TELEGRAM ACCOUNT 1 had been banned on Telegram. CHS-1 contacted HASSAN via the TARGET ACCOUNT.  HASSAN

---

[8] Per open sources, a nasheed is a song without musical instruments, similar to hymns.

introduced CHS-1 to the application SimpleX and provided a username for CHS-1 to contact HASSAN (SIMPLEX ACCOUNT 1).[9] HASSAN advised that SimpleX was very secure.

32.    On October 27, 2024, HASSAN sent CHS-1 a video via direct message using the TARGET ACCOUNT. CHS-1 observed that the video was ISIS propaganda that invited the listener to jihad.[10]

33.    After October 27, 2024, HASSAN and CHS-1 communicated on SimpleX with HASSAN using SIMPLEX ACCOUNT 1.

**B.    HASSAN recruited CHS-1 to conduct a mass casualty attack.**

34.    On November 15, 2024, HASSAN sent CHS-1 a pro-ISIS video that called for the killing of Jews. CHS-1 responded to this video by pledging allegiance to the leader of ISIS and calling HASSAN his emir.[11] CHS-1 told HASSAN that he was waiting on HASSAN's direction.

35.    On November 16, 2024, HASSAN reacted to the above messages with heart emojis. That same day, HASSAN deleted the video described in paragraph 32.

36.    On November 22, 2024, CHS-1 told HASSAN that if CHS-1 could not travel to join ISIS, it was Allah's will and that "maybe he wants me to act here."  HASSAN then responded that CHS-1 should, "...Aim for government buildings, use a Zastava rifle[12] if you can access one

---

[9] SimpleX is a private and encrypted messaging application.

[10] In my training and experience, I know that in Arabic "Jihad" means "struggle" and may refer to either an internal struggle or an external struggle, which could involve physical fighting or violence, against the non-believers or enemies of Islam.

[11] In my training and experience, I know that in Arabic "emir" means ruler, chief, or commander.

[12] Per open sources, Zastava is a Serbian based firearms manufacturer that produces rifles similar to AK-47s.

to carry out your attack, and All Praises to Allah, the Lord of the Worlds...Or buy a 3d printed gun and just buy ammunition[.]"

**C.    HASSAN provided CHS-1 instructions on how to prepare a martyrdom video.**

37.    Following the above, HASSAN provided CHS-1 with directions on making a martyrdom video, including to mask his identity, distort his voice, and record the video with a blank background saying the following:

> Your governments have been complicit in and utterly responsible for the deaths of millions of men women and children across al-Sham, Iraq, and our beloved Al Quds. Now has come for revenge. As you weaponize yourselves with your tanks and missiles and jets, we weaponize ourselves with the Wrath of Allah AZWJL upon you. However, you may try to find and kill us, Allah AZWJL will replace our fallen with more muwahidden,[13] bent on eradicating the corruption that you have brought forth...

**D.    HASSAN distributed information relating to an explosive device.**

38.    On November 23, 2024, CHS-1 asked HASSAN to select the target, the date of the attack, and asked HASSAN if he had any bomb-making manuals. HASSAN told CHS-1 that he could find a bomb-making instructions by looking for a specific search term on archive.org and also provided CHS-1 advice for bypassing Google's potential censorship of the search results. Eventually, however, HASSAN sent CHS-1 a direct link to the video with the bomb-making instructions. HASSAN suggested that, based on the size of the bomb, CHS-1 should get a backpack to put the bomb in.

---

[13] In my training and experience, "muwahidden" as it appears here is a typo most likely meant to read "mujahideen," which, in my training and experience, is an Arabic term meaning those who are fighting jihad on behalf of Islam.

39.     I have reviewed the bomb-making video described in paragraph 36.  In it, a masked male in military-style clothing explains the process to make acetone peroxide, an explosive. Throughout the video, an ISIS flag logo appears in the upper corner. The video is approximately fifteen minutes long and includes English subtitles. The video shows how to make both a detonator and a main explosive. The speaker then shows how to surround the explosive with shrapnel, specifically, ball bearings. After assembly, the speaker says, "we now have a ready bomb."

40.     On November 23, 2024, HASSAN instructed CHS-1 that if CHS-1 conducts the attack, CHS-1 should delete his SimpleX off his phone and save HASSAN's contacts somewhere else. HASSAN told CHS-1 that HASSAN cannot be caught giving instructions about attack planning because HASSAN believed he was already being watched due to his past.[14]

**E.     HASSAN identified the Consulate General of Israel as the target of the attack.**

41.     On November 23, 2024, HASSAN messaged CHS-1 that HASSAN believed it would be easier to commit an attack using small arms and be "martyred" by the police (i.e., suicide by cop) than to complete a suicide bombing successfully. In response, CHS-1 told HASSAN that CHS-1 was in New York and that getting a gun in New York was difficult. Upon learning this, HASSAN characterized CHS-1's location as "a goldmine of targets."  HASSAN stated that the best target for such an attack would be a building that represented the "Yahud."[15]  The next day, HASSAN sent CHS-1 the land address for the Consulate General of Israel.

---

[14] HASSAN was interviewed by the FBI in 2022 as a juvenile due, in part, to HASSAN's support for ISIS online.

[15] In my training and experience, I know that "Yahud" is an Arabic word for people of the Jewish faith.

42.     On December 12, 2024, I confirmed with the U.S. Department of State that on any given workday, numerous individuals working at the Consulate General of Israel in New York City would meet the definition of "internationally protected persons" as defined in 18 U.S.C. § 1116(b)(4)(B).

**F.      HASSAN continued to provide operational support to CHS-1 regarding the manufacture and use of an explosive device and the planned attack on the Consulate General of Israel.**

43.     On November 24, 2024, HASSAN sent CHS-1 two links to purchase 5.45x39mm cartridges and a rifle for the attack. CHS-1 told HASSAN that CHS-1 would learn more about the area of the planned attack. HASSAN responded by asking CHS-1 to keep him updated. CHS-1 asked HASSAN what to look for while conducting surveillance. HASSAN instructed CHS-1 to identify escape routes and ways to sneak in.

44.     On November 25, 2024, HASSAN messaged CHS-1 and said that he had spoken with ISIS media producers. HASSAN directed CHS-1 to create a video before committing the attack and provide it to HASSAN, commenting that if CHS-1 is not martyred in the attack, CHS-1 will be famous.

45.     On November 25, 2024, CHS-1 told HASSAN that CHS-1 had conducted surveillance on the previously identified attack target, and asked what CHS-1 should do now. In response, HASSAN told CHS-1 to "schedule a flight out of the country" and that it should be to "somewhere where there are no extradition laws." HASSAN further explained CHS-1 should save up money and take weeks to plan the attack.

46.     On November 27, 2024, HASSAN told CHS-1 that CHS-1 had two options to conduct the attack. He said CHS-1 could either murder people at the consulate with an assault rifle or detonate an explosive vest while standing in a group of targets. HASSAN specifically stated,

"Two options: lay havoc on them with an assault rifle or detonate a TATP[16] vest in the midst of them...The first option being that similar to Omar Mateen...The second as a regular istishhadi[17] operation[.]"

47.    HASSAN then sent CHS-1 the link to a website to buy a rifle and advised CHS-1 to use Bitcoin or other untraceable wallet option to buy the rifle in order to avoid being tracked down by investigators after the attack.

48.    On November 28, 2024, HASSAN instructed CHS-1 to livestream the attack using a particular application and to send him a link before carrying out the attack. HASSAN stated that he wanted to record the livestream footage of the operation to distribute it to the ISIS media department.

49.    HASSAN then emphasized that the most effective way to conduct the attack was with gunfire, but if CHS-1 was short on money then the only option was to use the bomb manual previously provided.  HASSAN stated that the materials to build the bomb would cost less than $200, and that a bomb ignited in the right place can do a lot of damage.

50.    On November 29, 2024, HASSAN asked CHS-1, "...[H]ow far away are u from buying the necessary materials?" CHS-1 told HASSAN that he had most of the materials and was studying timers and better detonation caps. In response, HASSAN replied, "good work[.]"

51.    On November 30, 2024, HASSAN instructed CHS-1 to download a particular disposable email application and to use it to send HASSAN the livestream link of the attack.

---

[16] In my training and experience, TATP is an acronym for Triacetone Triperoxide, an explosive compound. A TATP vest in this context appears to refer to suicide vests historically worn by terrorists to deploy explosives in crowds or buildings.

[17] In my training and experience, I know that "Istihhadi" means the death of a martyr or a heroic death.

**G.    HASSAN provided CHS-1 instructions on the type of shrapnel to use in the explosive device.**

52.    On December 3, 2024, HASSAN continued to direct CHS-1 on how to conduct an attack on the General Consulate of Israel in New York, NY and how to escape to a country with no extradition laws with the United States.

53.    That same day, HASSAN further advised CHS-1 on how to get out of the country after the attack and escape to a country with no extradition laws. HASSAN suggested CHS-1 travel to Borno rather than Sahel because Sahel is in Burkina Faso, which is harder to get to than Borno. HASSAN emphasized that both are "wilayah of the khilafah," or provinces of the Islamic State. HASSAN advised CHS-1 to get a plane ticket from New York to Abuja, Nigeria. Then fly from Abuja to Borno. HASSAN estimated it would only cost CHS-1 $700.

54.    On December 4, 2024 CHS-1 asked HASSAN which ball bearings would be the most effective for the bomb; HASSAN stated that 30mm aluminum ball bearings "will do the trick[.]" On December 4, 2024, HASSAN sent CHS-1 a link to a website to purchase ball bearings stating the site was a "DIY," or do it yourself, website and was unlikely to raise suspicion. HASSAN later changed his mind and instructed CHS-1 to buy 7-9mm ball bearings instead.

**III.    Evidence HASSAN Uses the TARGET ACCOUNT To Communicate with Others**

5.    On or about December 4, 2024, the FBI received records from Meta Platforms associated with the TARGET ACCOUNT pursuant to a 2703(d) Court Order.

6.    The results of that Court Order revealed that HASSAN, utilizing the TARGET ACCOUNT has been in direct message contact with at least 115 users on Instagram, resulting in

approximately 1899[18] messages received by HASSAN and approximately 1923 messages sent by HASSAN from July 29, 2024, to November 21, 2024.

7.      Based on this, I submit that HASSAN uses direct messaging on the TARGET ACCOUNT.

8.      Based on the entirely of the facts herein, I submit that HASSAN utilizes direct messaging on the TARGET ACCOUNT.  Furthermore, HASSAN has displayed a pattern of using multiple accounts to communicate with others about committing acts of violence and sharing violent content, and it is more likely than not that the TARGET ACCOUNT will contain additional evidence regarding his efforts to recruit others to commit attacks.

## BACKGROUND CONCERNING INSTAGRAM[19]

9.      Instagram is a service owned by Meta, a United States company and a provider of an electronic communications service as defined by 18 U.S.C. §§ 3127(1) and 2510.  Specifically, Instagram is a free-access social networking service, accessible through its website and its mobile application, that allows subscribers to acquire and use Instagram accounts, like the target account(s) listed in Attachment A, through which users can share messages, multimedia, and other information with other Instagram users and the general public.

---

[18] The data received from Meta included Group Chat messages drafted prior to HASSAN's admission to the group. Your affiant submits that these earlier-drafted messages were included because they loaded as part of the group's history of communications after HASSAN was admitted to the group.

[19] The information in this section is based on information published by Meta on its Instagram website, including, but not limited to, the following webpages: "Privacy Policy," https://privacycenter.instagram.com/policy/;    "Information    for    Law    Enforcement," https://help.instagram.com/494561080557017; and "Help Center," https://help.instagram.com.

10.     Meta collects basic contact and personal identifying information from users during the Instagram registration process.  This information, which can later be changed by the user, may include the user's full name, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, credit card or bank account number, and other personal identifiers.  Meta keeps records of changes made to this information.

11.     Meta also collects and retains information about how each user accesses and uses Instagram.  This includes information about the Internet Protocol ("IP") addresses used to create and use an account, unique identifiers and other information about devices and web browsers used to access an account, and session times and durations.

12.     Each Instagram account is identified by a unique username chosen by the user. Users can change their usernames whenever they choose but no two users can have the same usernames at the same time.  Instagram users can create multiple accounts and, if "added" to the primary account, can switch between the associated accounts on a device without having to repeatedly log-in and log-out.

13.     Instagram users can also connect their Instagram and Facebook accounts to utilize certain cross-platform features, and multiple Instagram accounts can be connected to a single Facebook account.  Instagram accounts can also be connected to certain third-party websites and mobile apps for similar functionality.  For example, an Instagram user can "tweet" an image uploaded to Instagram to a connected Twitter account or post it to a connected Facebook account, or transfer an image from Instagram to a connected image printing service.  Meta maintains records of changed Instagram usernames, associated Instagram accounts, and previous and current connections with accounts on Meta and third-party websites and mobile apps.

16

14.     Instagram users can "follow" other users to receive updates about their posts and to gain access that might otherwise be restricted by privacy settings (for example, users can choose whether their posts are visible to anyone or only to their followers).  Users can also "block" other users from viewing their posts and searching for their account, "mute" users to avoid seeing their posts, and "restrict" users to hide certain activity and prescreen their comments.  Instagram also allows users to create a "close friends list" for targeting certain communications and activities to a subset of followers.

15.     Users have several ways to search for friends and associates to follow on Instagram, such as by allowing Meta to access the contact lists on their devices to identify which contacts are Instagram users.  Meta retains this contact data unless deleted by the user and periodically syncs with the user's devices to capture changes and additions.  Users can similarly allow Meta to search an associated Facebook account for friends who are also Instagram users.  Users can also manually search for friends or associates.

16.     Each Instagram user has a profile page where certain content they create and share ("posts") can be viewed either by the general public or only the user's followers, depending on privacy settings.  Users can customize their profile by adding their name, a photo, a short biography ("Bio"), and a website address.

17.     One of Instagram's primary features is the ability to create, edit, share, and interact with photos and short videos.  Users can upload photos or videos taken with or stored on their devices, to which they can apply filters and other visual effects, add a caption, enter the usernames of other users ("tag"), or add a location.  These appear as posts on the user's profile.  Users can remove posts from their profiles by deleting or archiving them.  Archived posts can be reposted because, unlike deleted posts, they remain on Meta's servers.

18.     Users can interact with posts by liking them, adding or replying to comments, or sharing them within or outside of Instagram.  Users receive notification when they are tagged in a post by its creator or mentioned in a comment (users can "mention" others by adding their username to a comment followed by "@").  An Instagram post created by one user may appear on the profiles or feeds of other users depending on a number of factors, including privacy settings and which users were tagged or mentioned.

19.     An Instagram "story" is similar to a post but can be viewed by other users for only 24 hours.  Stories are automatically saved to the creator's "Stories Archive" and remain on Meta's servers unless manually deleted.  The usernames of those who viewed a story are visible to the story's creator until 48 hours after the story was posted.

20.     Instagram allows users to broadcast live video from their profiles.  Viewers can like and add comments to the video while it is live, but the video and any user interactions are removed from Instagram upon completion unless the creator chooses to send the video to IGTV, Instagram's long-form video app.

21.     Instagram Direct, Instagram's messaging service, allows users to send private messages to select individuals or groups.  These messages may include text, photos, videos, posts, videos, profiles, and other information.  Participants to a group conversation can name the group and send invitations to others to join.  Instagram users can send individual or group messages with "disappearing" photos or videos that can only be viewed by recipients once or twice, depending on settings.  Senders can't view their disappearing messages after they are sent but do have access to each message's status, which indicates whether it was delivered, opened, or replayed, and if the recipient took a screenshot.  Instagram Direct also enables users to video chat with each other directly or in groups.

18

22.     Instagram offers services such as Instagram Checkout and Facebook Pay for users to make purchases, donate money, and conduct other financial transactions within the Instagram platform as well as on Facebook and other associated websites and apps.  Instagram collects and retains payment information, billing records, and transactional and other information when these services are utilized.

23.     Instagram has a search function which allows users to search for accounts by username, user activity by location, and user activity by hashtag.  Hashtags, which are topical words or phrases preceded by a hash sign (#), can be added to posts to make them more easily searchable and can be "followed" to generate related updates from Instagram.  Meta retains records of a user's search history and followed hashtags.

24.     Meta collects and retains location information relating to the use of an Instagram account, including user-entered location tags and location information used by Meta to personalize and target advertisements.

25.     Meta uses information it gathers from its platforms and other sources about the demographics, interests, actions, and connections of its users to select and personalize ads, offers, and other sponsored content.  Meta maintains related records for Instagram users, including information about their perceived ad topic preferences, interactions with ads, and advertising identifiers.  This data can provide insights into a user's identity and activities, and it can also reveal potential sources of additional evidence.

26.     In some cases, Instagram users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications,

including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

27.    For each Instagram user, Meta collects and retains the content and other records described above, sometimes even after it is changed by the user (including usernames, phone numbers, email addresses, full names, privacy settings, email addresses, and profile bios and links).

28.    In my training and experience, evidence of who was using Instagram and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

29.    For example, the stored communications and files connected to an Instagram account may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, voice messages, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

30.    In addition, the user's account activity, logs, stored electronic communications, and other data retained by Meta can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, messaging logs, photos, and videos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers

or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

31.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

32.     Other information connected to the use of Instagram may lead to the discovery of additional evidence. For example, associated and linked accounts, stored communications, photos, and videos may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators. In addition, stored communications, contact lists, photos, and videos can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

33.     Therefore, Meta's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Instagram. In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## **CONCLUSION**

34.     Based on the forgoing, I request that the Court issue the proposed search warrant.

35.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Meta. Because the warrant will be served on Meta, who will then compile

the requested records at a time convenient to it, reasonable cause exists to permit the execution of

the requested warrant at any time in the day or night.

Respectfully submitted,

*Tyler Ellefson*

Tyler Ellefson
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me by reliable
electronic means pursuant to Federal Rule of
Criminal Procedure 4.1 on December 16, 2024

*William E. Fitzpatrick*

Honorable William E. Fitzpatrick
UNITED STATES MAGISTRATE JUDGE

22

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with Instagram Account UID:

- 67720752584

that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1 Meta Way, Menlo Park, CA 94025

1

## **ATTACHMENT B**

### **Particular Things to be Seized**

**I.**     **Information to be disclosed by Meta Platforms, Inc. (**"**Meta**"**)**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, and including any messages, records, files, logs, or other information that has been deleted but is still available to Meta, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on November 18, 2024, Meta is required to disclose the following information to the government for each account or identifier listed in Attachment A:

A.     All business records and subscriber information, in any form kept, pertaining to the account, including:

      1.     Identity and contact information (past and current), including full name, e-mail addresses, physical address, date of birth, phone numbers, gender, hometown, occupation, websites, and other personal identifiers;

      2.     All Instagram usernames (past and current) and the date and time each username was active, all associated Instagram and Facebook accounts (including those linked by machine cookie), and all records or other information about connections with Facebook, third-party websites, and mobile apps (whether active, expired, or removed);

      3.     Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

      4.     Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

      5.     All advertising information, including advertising IDs, ad activity, and ad topic preferences;

      6.     Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers, June 1, 2024 to Present**;**

      7.     Privacy and account settings, including change history; and

8. Communications between Meta and any person regarding the account, including contacts with support services and records of actions taken;

B. All content (whether created, uploaded, or shared by or with the account), records, and other information relating to videos (including live videos and videos on IGTV), images, stories and archived stories, past and current bios and profiles, posts and archived posts, captions, tags, nametags, comments, mentions, likes, follows, followed hashtags, shares, invitations, and all associated logs and metadata, June 1, 2024 to Present;

C. All content, records, and other information relating to communications sent from or received by the account June 1, 2024 to Present, including but not limited to:

1. The content of all communications sent from or received by the account, including direct and group messages, and all associated multimedia and metadata, including deleted and draft content if available;

2. All records and other information about direct, group, and disappearing messages sent from or received by the account, including dates and times, methods, sources and destinations (including usernames and account numbers), and status (such as delivered, opened, replayed, screenshot);

3. All records and other information about group conversations and video chats, including dates and times, durations, invitations, and participants (including usernames, account numbers, and date and time of entry and exit); and

4. All associated logs and metadata;

D. All content, records, and other information relating to all other interactions between the account and other Instagram users June 1, 2024 to Present, including but not limited to:

1. Interactions by other Instagram users with the account or its content, including posts, comments, likes, tags, follows (including unfollows, approved and denied follow requests, and blocks and unblocks), shares, invitations, and mentions;

2. All users the account has followed (including the close friends list), unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow, and of users who have followed, unfollowed, blocked, unblocked, muted, restricted, or denied a request to follow the account;

3. All contacts and related sync information; and

4. All associated logs and metadata;

E. All records of searches performed by the account from June 1, 2024 to Present; and

2

F. All location information, including location history, login activity, information geotags, and related metadata June 1, 2024 to Present.

Meta is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

### Information to be seized by the government

All information described above in Section I that constitutes evidence and instrumentalities of violations of 18 U.S.C. § 2339B (providing material support or resources to a Foreign Terrorist Organization), 18 U.S.C. § 2339A (providing material support to terrorists), 18 U.S.C. § 2332a(a)(2) (use of weapons of mass destruction causing death), 18 U.S.C. § 842(p)(2)(A) (distribution of information relating to explosives, destructive devices, and weapons of mass destruction in furtherance of the commission of a federal crime of violence, that is 18 U.S.C. §§ 1116(a), (b)(4)(B), 1111 (first-degree murder of internationally protected persons) (hereinafter "Target Offenses") involving Abdullah Ezzeldin Taha Mohamed Hassan (hereinafter "Target Offenses") between August 1, 2024, and present, including:

a. Records, documents, communications, or other information relating to foreign terrorist organizations, terrorists, terrorism, and/or jihad;

b. Records, documents, communications, or other information concerning efforts to radicalize individuals to an extremist ideology.

c. Records documents, communications, or other information concerning efforts to provide material support to designated foreign terrorist groups, terrorists, terrorism, and/or jihad.

d. Records, documents, communications, and other information concerning discussions pertaining to acts of violence, plots to commit acts of violence, statements indicating violent ideation, target research, surveillance, target selection, target probing, possession of a deadly weapon, and/or attempts to gain access to a deadly weapon.

3

e.  Records, information, evidence, communications, and correspondence regarding any threats to use bombs, destructive devices, weapons of mass destruction, or explosive devices.

f.  Records, information, evidence, communications, and correspondence regarding instructions or efforts to teach how to make bombs, destructive devices, weapons of mass destruction, or explosive devices.

g.  Records, information, evidence, communications, and correspondence regarding any plans, attempts, or efforts to, or discussions regarding, damage or destroy property by using bombs, destructive devices, weapons of mass destruction, or explosive devices.

h.  Records, information, evidence, communications, and correspondence regarding any plans, attempts, or efforts to, or discussions regarding, injuring or killing a person or persons by using bombs, destructive devices, weapons of mass destruction, or explosive devices.

i.  Records, information, and evidence related to technical and operational security measures or mechanisms designed to obfuscate or encrypt messages, documents, or devices, to include messaging applications.

j.  Evidence indicating how and when the Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the Account owner;

k.  Evidence indicating the Account owner's state of mind as it relates to the crime under investigation;

l.  The identity of the person(s) who created or used the Account, including records that help reveal the whereabouts of such person(s).

m.  The identity of the person(s) who communicated with the Account, including records that help reveal their whereabouts.

n.  Location information regarding where the user of the Account was located during the suspected commission of the Target Offenses.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical

experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Filter Review Notice Procedures

If the government identifies seized materials that are potentially attorney-client privileged or subject to the work product doctrine ("protected materials"), the Prosecution Team will discontinue review until a Filter Team of government attorneys and agents is established. The Filter Team will have no future involvement in the investigation of this matter. The Filter Team will review seized communications and segregate potentially protected materials, i.e., communications that are to/from an attorney, or that otherwise reference or reflect attorney advice. At no time will the Filter Team advise the Prosecution Team of the substance of any of the potentially protected materials. The Filter Team then will provide all communications that are not potentially protected materials to the Prosecution Team and the Prosecution Team may resume its review. If the Filter Team concludes that any of the potentially protected materials are not protected (e.g., the communication includes a third party or the crime-fraud exception applies), the Filter Team must obtain either agreement from defense counsel/counsel for the privilege holder or a court order before providing these potentially protected materials to the Prosecution Team. If possible, government attorneys will engage with the privilege holder to resolve privilege determinations before proceeding to court for judicial review.

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms., and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of by Meta Platforms. The attached records consist of _____ [[**GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)**]]. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta Platforms and they were made by Meta Platforms as a regular practice; and

b.      such records were generated by Meta Platforms's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of X Corp. in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Meta Platforms, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                    Signature

6